# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **HERBERT CHILDS,** | CASE NO. 8:06CV546 |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| **OMAHA PUBLIC POWER DISTRICT,** | |
| Defendant. | |

This matter is before the Court on the Defendant's Motion for Summary Judgment (Filing No. 25). On August 15, 2006, Herbert Childs ("Childs") filed a Complaint against the Defendant, Omaha Public Power District ("OPPD"), alleging OPPD failed to promote him based on his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (2000).[1]  (Filing No. 1, Complaint ("Complaint"), P 3.)  For the reasons set forth below, the Motion for Summary Judgment will be granted.

**FACTS**

OPPD is a public corporation and a political subdivision of the state of Nebraska. (Filing No. 1, Complaint, ¶ II.)  Childs is an African-American male who is currently employed by OPPD at its Ft. Calhoun Nuclear Power Plant, in Ft. Calhoun, Nebraska. (Filing No.32, Childs's Index in Opposition to Motion for Summary Judgment, Exhibit 1, Affidavit of Herbert Childs "Childs Aff." ¶ 2.)  Childs began working at the Ft. Calhoun

---

[1] The Complaint also alleges OPPD discriminated against Childs in violation of 42 U.S.C. § 1981 and the Nebraska Fair Employment Practices Act ("NFEPA") Neb. Rev. Stat. 48-1101 *et seq.* (2006). (Complaint, P 4-6.)  The Court analyzes § 1981 claims and state law claims within the same framework as those brought under federal law.  *See*, *Davis v. KARK-TV, Inc.,* 421 F.3d 699, 703 (8th Cir. 2005); *McGinnis v. Union Pacific Railroad*, 496 F.3d 868 (8th Cir. 2007), *citing Riesen v. Irwin Indus. Tool Co.*, 272 Neb. 41, 717 N.W.2d 907, 913-14 (Neb. 2006) (noting Nebraska employment discrimination laws mirror federal legislation; thus, Nebraska looks to federal law in analyzing these claims).

Nuclear Power Plant in the Nuclear Security Department in 1986 and has worked there continuously since that date. (Childs Aff. ¶ 2.)

In the summer of 2004, Childs was a Shift Security Supervisor (Grade S3) and reported directly to Alan Clark, a male Caucasian, who was then Supervisor - Nuclear Security Operations. (Filing No. 27, OPPD's Index of Evidence in Support of Motion for Summary Judgment, Exhibit 3, Deposition of Al Clark "Clark Dep." 41:25-42:9.) During that time, Clark was promoted to Manager of Nuclear Security (Grade S8) after the retirement of another employee. (Clark Dep. 8:23-9:13.) In June 2004, OPPD posted a Position Description seeking applicants for Clark's former position, Supervisor - Nuclear Security Operation (Grade S5). (Filing No. 27, Exhibit 6, Deposition Exhibit 1, Position Posting/Description "Position Description," P 1.) The OPPD Human Resources Department screened the applications and forwarded those who met at least the minimum qualifications to Clark, who was the Hiring Manger for his former position. (Filing, No. 27, Exhibit 4, Deposition of Rhonda Gross "Gross Dep." 4:24-5:11, 15-24.) Clark selected four individuals as "qualified" for the position to be interviewed - Childs, Ron Undajon, an Asian-American male, Brian Obermeyer, a Caucasian male, and Jeffrey Nelson, a Caucasian male. (Clark Dep.12:12-17; 21:9-11.)

In July 2004, the four men were interviewed by a behavioral interview panel. (Clark Dep. 12:12-17.) The interview panel consisted of Clark and two other OPPD employees, Rhonda Gross, a representative from Human Resources, and Richard Haug, a Manager of Radiation Protection, a peer of Clark's. (Gross Dep. 4:17-5:1 and Filing No. 37, Exhibit 2, Deposition of Richard Haug "Haug Dep." 11:6-10.) OPPD used the behavioral interview system that is used in most of its hiring decisions. (Filing No. 27, Exhibit 5, Affidavit of

Sheri (Garcia) Anderson "Anderson Aff." ¶ 24.)[2]  The questions asked during the interview were selected by Clark out of OPPD's pre-packaged behavioral interview questions. (Gross Dep. 36:4-11.)  The pre-packaged questions are divided by competency area and one question is selected by the Hiring Manager for each competency area that correlates to skills listed in the job description.  (Gross Dep. 35:17-36:3.)  All of the pre-packaged questions that could be selected by the Hiring Manager were provided to the candidates, including Childs, prior to the interview.  (Childs Dep. 58:9-19.)

Each candidate was interviewed by the panel for 45-60 minutes.  (Gross Dep.14:6-8.)  Immediately after each individual interview, the three panel members discussed that candidate's performance during the interview.  (Clark Dep. 61:13-62:9; Haug Dep. 17:21-19:1; Gross Dep. 11:14.)  During this discussion period, the candidate's answers to the behavioral interview questions were assessed and a score was recorded for each of the competency areas.  (Gross Dep. 14:15-15:3.)  The panel continued with the next candidate under the same process.  (Gross Dep. 14:15-15:3)  At the end of all interviews, the three panel members generally discussed all four candidates; however, no changes were made to the individual scores that were previously recorded.  (Haug Dep. 23:15-24:2; Gross Dep. 36:21-37:11)

The scores were tabulated by Gross and at the conclusion of the interviews the candidates were ranked as follows:  Obermeyer - 110; Undajon - 104; Childs - 96; and

---

[2] Tesnar testified that in some cases a position would not be posted or a candidate would be selected without an interview. (Tesnar Dep. 6:19-7:19.) OPPD generally uses the behavioral interview process when interviewing posted supervisory or management level jobs. (Anderson Aff. ¶ 24.)

Nelson - 72.  (Filing No. 32, Deposition Exhibit 3, Score Sheets.)  Regarding Obermeyer's performance during his interview, Haug testified:

> Brian Obermeyer stood out from an interview process perspective.  From a job knowledge perspective, they all had – they all had good credentials, they all had good knowledge of how security works and runs. . . . [Obermeyer] had multiple examples for his – for the questions.  He had recent examples for his questions, they weren't dated in length.  He gave a lot of detail and was – came in well prepared from a preparatory perspective, did a very good interview.

(Haug Dep. 34:21-25 35:4-9.)  Haug testified that Childs's interview was not as good as Obermeyer's or Undajon's.  (Haug Dep. 39:18-20.)  Haug assessed Childs's interview as "average." (Haug Dep. 39:1.)  Specifically, Haug testified that "[Childs] answering of the questions wasn't as crisp.  They were a little dated.  Didn't have a lot of detail, made it more difficult to determine the completeness of the answer.  That is how I judged it." (Haug Dep. 39:5-9.)

Gross testified that Childs did not answer the questions well during the interview process, "I went away with the feeling that he was bothered by us asking questions because we should already know this — the answers and stuff like that." (Gross 15:9-12.) Gross further testified that Childs had a "nonchalant attitude of not really wanting to be there, be in the interview. . . . We had to do a lot more probing with his questions.  We had to, you know – instead of him going through and giving us a full example, we had to keep asking the question a few times." (Gross Dep. 15:16-17; 22-25.)

Clark informed his supervisor, Mary Tesnar, of his recommendation that Obermeyer be offered the position based on the behavioral interview scores.  (Tesnar Dep. 33:2-34:4.) Tesnar testified that Clark indicated that Obermeyer had the highest score on the behavioral interview and that Clark wanted to promote Obermeyer because he was the

candidate with the highest score.  (Tesnar Dep. 35:12-36:1.)  Tesnar approved the promotion in July 2004.

After Childs was notified that he did not receive the promotion he filed an internal complaint as well as a complaint with the Nebraska Equal Opportunity Commission ("NEOC") alleging race and age discrimination.[3]  (Filing No. 27, Deposition Exhibit 4, Aug. 16, 2004 Letter to Rubin Carter and Exhibit 6, NEOC Charge of Discrimination.)  OPPD conducted an internal investigation regarding the allegations.  (Anderson Dep. 5:12-13.)  As part of the investigation, Sheri (Garcia) Anderson and other members of the OPPD human resources and labor relations staff conducted interviews of Childs, Undajon, Clark, and Haug.  (Anderson Dep. 7:15-8:5; 16:18-22.)  Anderson summarized her interviews in an "Internal Complaint Summary."  (Anderson Dep. 6:18-22.)

During the investigation, the interview panel members provided information regarding Obermeyer and Childs that was used during the decision-making process, as well as other information that was not discussed or considered by the interview panel.  (Anderson Dep. 17:8-17; see also Haug Dep. 35:22-36:22; 38:1-3.)   During the investigation, Clark indicated that Childs had recent problems with security officers and a report of allowing an officer to switch shifts that violated work hour restrictions.  (Clark Dep. 59:20-60:10; Childs Dep. 100:23-101:13.)  In particular, Clark stated that, there was a concern regarding a rumor involving two security officers and a report that Childs was singling out another employee, but that Clark had taken Childs's side during both the incidences.  (Clark Dep. 75:20-77:10)

---

[3] Childs has since abandoned his claim that age was a factor in the hiring decision.

In the end, the investigator concluded that Obermeyer was more prepared, articulated examples in great detail, was professional and comfortable during his interview, and was "far superior in interviewing abilities." (Anderson Dep. 13:13-18.)  OPPD filed a written response to Childs's charge. (Anderson Dep. 9:18-22.)  In its response, OPPD listed six reasons why Childs was not selected and eleven reasons for selecting Obermeyer. (Filing No. 32, Deposition Exhibit 25, January 25, 2005 Letter to the NEOC by Sherri Garcia of OPPD.)  On January 20, 2006, the NEOC issued its Determination of Reasonable Cause to believe that Childs had been the victim of race and age discrimination in the Obermeyer appointment. (Filing No. 32, Exhibit 2, Affidavit of Thomas F. Hoarty, Jr. "Hoarty Aff.", Attachment 2b, NEOC Commission Determination.)

In May 2005, OPPD created a new S5 position at the Ft. Calhoun Nuclear Security Area known as the Supervisor of Security Compliance.  (Clark Dep. 100:8-104:24.) Undajon was placed in this position without the use of an application and interview process. (Clark Dep. 104:21-24.)  On October 3, 2005, Childs was promoted to replace Undajon as the Nuclear Security Coordinator (S4). (Childs Aff. ¶ 12; Hoarty Dep. Exhibit 2a, Memorandum of Appointment of Herbert L. Childs to Senior Nuclear Security Cooridinator.)  This selection was made by Obermeyer and approved by Clark. (Clark Dep. 99:17-100:7.)  Childs continues to hold the Nuclear Security Coordinator position. (Clark Dep. 99:17-100:1.)

Childs had previously applied for two positions for which he was not selected. Childs does not allege that he was not selected for these positions based on his race. (Childs Dep. 39:6-40:24.)  He does not allege that either Haug or Gross used race in their decision process. (Childs Dep. 66:13-19.)  Additionally, at no time during the interview

6

process or during the discussions with the panel was the race of any applicant discussed or taken into account in the decision-making process. (Haug Dep. 28:2-29:8; Clark 60:22-61:5; Gross 37:12-21.) Childs testified that he believes that the only person who discriminated against him was Clark, and that while he does not consider Clark to be a racist, Childs does believe that there was a "good ol' boy system" and that Clark promoted somebody that was like him. (Childs Dep. 71:11-20; 102:6-13; 109:15-21.) Thus, at issue in this matter is only whether OPPD, through their Hiring Manager Al Clark, discriminated against Childs in this one promotion decision.

## STANDARD OF REVIEW

In the context of a summary judgment motion, the Court's function is to consider the evidence and determine whether the moving party is entitled to judgment as a matter of law. The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*quoting* Fed. R. Civ. P. 56(c)). In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.*

While there is no discrimination case exception to the application of Fed.R.Civ.P. 56, "we must exercise particular caution when examining the factual question of intent to ensure that we dutifully extend all justifiable inferences in favor of the non-moving party." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006) (citations omitted). Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim. *Id.* at 1117.

## ANALYSIS

An action alleging employment discrimination in violation of Title VII can survive a motion for summary judgment in one of two ways. First, the plaintiff can produce direct evidence of discrimination, that is, "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Russell v. City of Kansas City,* 414 F.3d 863, 866 (8th Cir. 2005) (*quoting Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Alternatively, if the plaintiff lacks direct evidence of intentional discrimination, he or she may survive the employer's motion for summary judgment by "creating the requisite inference of unlawful discrimination" through the familiar three-step burden-shifting analysis originating in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 866-67. A plaintiff proceeding under the three-stage, burden-shifting standard set forth in *McDonnell Douglas*, must first establish a prima facie case of discrimination. Once the prima facie case is established, the burden shifts to the defendant to articulate a non-discriminatory reason

for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993). If the defendant articulates such a reason, the plaintiff must respond with sufficient evidence that the proffered reason was really a pretext for intentional discrimination. At all times, the burden of persuasion on the ultimate question of discrimination remains with the plaintiff. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.133, 142 (2000).

Because there is no direct evidence of discrimination alleged in this case, in order to establish a prima facie case of race discrimination, Childs must show that (1) he is a member of a protected group; (2) he was qualified and applied for an available position; (3) he was rejected; and (4) employees similarly situated but not part of the protected group were promoted instead. *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1046 (8th Cir. 2002) (*citing Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir. 1996)). The Court finds that Childs's evidence is sufficient to show he was rejected under circumstances that give rise to an inference of unlawful discrimination.

The burden then shifts to OPPD to state a legitimate, non-discriminatory reason for deciding not to promote Childs. OPPD asserts the evidence indicates that it utilized a standardized behavioral interview with prepackaged questions, that the interview panel gave two employees higher marks on the behavioral interview than Childs, and the position was given to the person with the highest score - Obermeyer. Haug and Gross both testified that Obermeyer and Undajon performed better during the behavioral interview than Childs. Childs confirmed that he did not provide full and complete answers during the behavioral interview. Childs stated to the internal investigator that he believed Clark "should have been aware of his qualifications and experiences since he has worked for him

9

for so many years and did not feel it was necessary to get into a great deal of detail during the interview." (Anderson Dep. 32:19-33:2.)

Thus, the Court finds that OPPD has articulated a legitimate, non-discriminatory reason for its hiring decision, *i.e.*, that it selected the candidate with the highest score during the behavioral interview process. In the final step, Childs:

> can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that [an unlawful consideration] was a determinative factor in the adverse employment decision.
>
> * * *
>
> It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination. . . . The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.

*Mayer v. Nextel West Corp.*, 318 F.3d 803, 807-808 (8th Cir. 2003) (emphasis in original) (citations omitted).

Childs argues that the use of the behavioral interview scores for making the hiring decision is merely pretextual because Clark could have manipulated the interview process. The only evidence offered by Childs is his affidavit that he has been a member of interview panels where the panelist allegedly deferred to the Hiring Manager. (Childs Aff. ¶ 11.) In this case however, the assertion that Clark manipulated the scoring is directly controverted by the testimony of Haug and Gross. Both testified that they agreed with scores provided to each of the candidates and both testified that they thought Obermeyer and Undajon preformed better than Childs during the interview.

10

Furthermore, it is undisputed that Clark selected the interview questions from the OPPD prepackaged questions that correlate to the competencies listed in the job description.[4] Childs provides no evidence that indicates that any of the questions were not OPPD pre-packaged questions or that they did not correlate to the skills listed in the job description. Childs, like the other candidates, was provided with copies of all the questions that might be asked during the interview in advance of the interview. (Childs Dep. 58:9-19.) Haug and Gross testified that the same initial questions and follow-up probing questions were asked of all the candidates. Finally, there is no evidence that the selected questions favored Obermeyer or disfavored Childs.

Childs also argues that the use of interview scores had to be a mere pretext because Obermeyer was not the most qualified candidate based on a "one-hour reportable" incident less than one year prior to the promotion date.[5] Childs argues that

---

[4] For example, the job description at issue included the following competency skill: "Shall have demonstrated well-developed written and verbal communication skills to the satisfaction of management." (Position Description, P 1.) The question posed during the interview from the OPPD pre-packaged questions was listed under "Communication Skills: Listening effectively, transmitting information accurately and understandably, and activity seeking feedback nondefensively." (Filing No. 27, Exhibit 7, Deposition Exhibit 2, Haug Interview Notes "Haug Interview Notes," P 1.) The interview panel asked Lead Question 1.1: "Describe a situation when you had to rapidly share critical information with people in different functional groups." The interviewers also asked each candidate "Follow-up Probes," which included "How did you determine what needed to be communicated? How did you ensure your information was accurate? What method or methods did you use to disseminate the information? What follow-up steps did you take to ensure everyone who needed the information got it in a timely way and understood it?" (Haug Interview Notes, P 1.)

[5] A "one-hour reportable" event is a security breach that must be reported to the Nuclear Regulatory Commission within one hour of its occurrence. (Clark Dep. 51:19-23.) Additionally, at the time the hiring decision was made, both Childs and Obermeyer were pursuing Bachelors degrees and had completed similar amounts of credits towards their respective degrees. Childs argues that because he subsequently completed his degree

11

Clark either intentionally downplayed the importance of the one-hour incident or didn't inform the panel members or the internal review board of the one-hour incident. The record indicates that Obermeyer brought up the one-hour incident during his interview without prompting, that Gross and Haug were aware of the seriousness of a one-hour incident and that Mary Tesnar, Clark's supervisor who approved Clark's recommendation, was also aware of the incident and its severity. (Haug Dep. 41:7-43:20; Gross Dep. 21:24 - 23:21; and Tesnar Dep. 21:11-14.) Further, there is no evidence that Clark made any misrepresentations regarding the one-hour incident. While the promotion of Obermeyer in spite of the one-hour incident less than one year before his promotion does raise cause for concern, this Court's inquiry is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair or correct. *McKay v. U.S. Dep't Trans.*, 340 F.3d 695, 700 (8th Cir. 2003), *citing Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 973 (8th Cir. 1994). Childs has not provided any evidence that the one-hour incident rendered Obermeyer unqualified for the promotion. To the contrary, Childs testified that Obermeyer was qualified for the position. (Childs Dep. 55:1-9.)

Childs asserts that Clark intentionally graded Childs down on one section of his review in the performance review in February 2004 so that Childs's performance review would be at the same level as Obermeyer's. (Childs Dep. 107:18-23.)[6] When asked about the score at his deposition, Clark indicated that all three shift supervisors should have

---

and Obermeyer did not, Obermeyer should have been considered less qualified in retrospect. The Court finds no merit in this argument.

[6] Childs does not explain how Clark would have known four months before the position was posted that Childs and Obermeyer would both apply for the position and, therefore, intentionally gave Childs a lower score on one section of his performance review.

received the same score, and that if Childs's mark was lower, it was a mistake. (Clark Dep. 45-49.)[7] Even if Clark intentionally gave Childs a lower score, it is not evidence of discrimination. The uncontroverted testimony of Haug and Gross shows that the panelists did not review or take into account in any way the past performance reviews when scoring during the interview process. The scores were based solely on the answers provided during the interview. Further, while Childs attempts to argue that the promotion decision was based on the past performance reviews and the interview scores, it is clear that Tesnar approved the promotion of the individual with the highest interview scores without reviewing the past performance reviews. Clark did use the performance reviews to select who would be granted an interview, and therefore, they were a consideration. However, Childs was selected for an interview and consequently cannot show that he was discriminated against based on the lower score.

Further, Childs asserts that Clark lied to internal investigators regarding the reasons why Childs was not selected for the position, and that this is evidence of Clark's discriminatory intent. Even viewing the evidence in the light most favorable to Childs, there is no evidence that any of these factors were part of the interview panel's decision. Anderson testified that those were not reasons provided by the panel, but other reasons given by Clark when pressed to give additional reasons outside of the behavioral interview scores that were actually used. Haug and Gross testified they did not know of Childs's

---

[7] The record is not clear whether changing the score would have increased Childs's overall performance score, but for purposes of this motion, the court determines that it would.

13

alleged work hour restriction violation or problems with the security officers.[8] As indicated above, the evidence clearly shows that the candidates were ranked only on the quality of their answers to the behavioral interview questions not based on their prior performance reviews or other prior job performance factors.

Childs also argues that because Clark has never hired a member of a racial minority as a Hiring Manager this is also evidence that Childs was a victim of discrimination. (Clark Dep. 116:9-12.) The record indicates that Clark served on only one other panel that interviewed an African-American candidate. (Clark Dep.121:22-122:3) Clark testified that particular candidate was not selected because of indiscretions with female employees. (Clark Dep. 123:15-23.) Clark also testified that he told that candidate why he was not selected, and the candidate understood and he did "straighten up his act" and was selected for promotion the next time there was an opening. (Clark Dep. 123:23-124:4.) Further, the evidence shows that Clark did approve the hiring and promotion of minorities when he was the supervisor of the Hiring Manager, including approval of Childs's promotion to Senior Nuclear Security Coordinator in 2005. (Clark Dep. 109:1-8.)

While the Court acknowledges that, when filling a position such as a supervisor of nuclear security operations, it may be a better business practice to take into account objective information such as past performance reviews, superior educational qualifications, and past safety violations at all stages of the hiring process, there is no evidence that OPPD's failure to do so was a practice designed to discriminate against Childs or other African-Americans. The court does not sit as a super-personnel

---

[8] Additionally, Childs had a fitness-for-duty violation in 1992 for a positive drug test which was not considered by the interview panel. (Childs Dep. 26:12-27:23.)

department to oversee management decisions. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771,781 (8th Cir. 1995); *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136-37 (8th Cir. 1999). The evidence shows that the behavioral panel scores were based only on the candidates' performance in the interviews and there is no evidence that any candidate's score was based on his or her race. *See McKay*, 340 F.3d at, 700 (upholding summary judgment where the hiring decision was made based on the candidate with the best interview); *Gentry v. Georgia-Pacific Corp.*, 250 F.3d 646, 650-51 (8th Cir. 2000) (no evidence of discrimination in the promotion selection process when the successful candidate graded higher on scored interview process). Childs has not met his burden of coming forward with evidence that OPPD's legitimate, non-discriminatory reason for its action was in fact a pre-text for discrimination against Childs based on his race.

## CONCLUSION

For the foregoing reasons, the Court concludes that there are no genuine issues of material fact with respect to Childs's claim of race discrimination, and the Defendant, Omaha Public Power District, is entitled to judgment in its favor as a matter of law.

IT IS ORDERED:

1. The Defendant's Motion for Summary Judgment (Filing No. 25) is granted; and

2. A separate judgment will be entered dismissing the Plaintiff's Complaint, with prejudice.

DATED this 6th day of November, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge